IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-364

Filed 3 September 2024

Vance County, No. 20CVD592

OLIVER HARNEY, Plaintiff,

v.

CHRISTINA HARNEY, Defendant.

Appeal by defendant from order entered 15 June 2022 by Judge S. Katherine Burnette in District Court, Vance County. Heard in the Court of Appeals 14 November 2023.

> *Gailor Hunt Davis Taylor & Gibbs, PLLC, by Jonathan S. Melton, for plaintiff-appellee.*
>
> *The Law Office of Colon & Associates, PLLC, by Arlene L. Velasquez-Colon and Kendra R. Alleyne, for defendant-appellant.*

STROUD, Judge.

Defendant-mother appeals from a custody order granting custody of her minor child, Sam[1], to Plaintiff, who is Sam's maternal grandfather. Although Sam was born in New York and a temporary custody order was entered in New York shortly after his birth, the New York court declined to exercise continuing jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") following a hearing in compliance with North Carolina General Statute Section 50A-207. *See*

---

[1] We have used a pseudonym for the minor child to protect his identity.

N.C. Gen. Stat. § 50A-207(a) (2023) ("A court of this State which has jurisdiction under this Article to make a child-custody determination may decline to exercise its jurisdiction at any time if it determines that it is an inconvenient forum under the circumstances, and that a court of another state is a more appropriate forum. The issue of inconvenient forum may be raised upon motion of a party, the court's own motion, or request of another court."). North Carolina has subject matter jurisdiction over custody under the UCCJEA. *See* N.C. Gen. Stat. § 50A-203 (2023) ("Except as otherwise provided in G.S. 50A-204, a court of this State may not modify a child-custody determination made by a court of another state unless a court of this State has jurisdiction to make an initial determination under G.S. 50A-201(a)(1) or G.S. 50A-201(a)(2) and: (1) The court of the other state determines it no longer has exclusive, continuing jurisdiction under G.S. 50A-202 or that a court of this State would be a more convenient forum under G.S. 50A-207[.]"). The trial court's detailed and extensive findings of fact, made by clear and convincing evidence, are supported by competent evidence. These findings support the trial court's conclusion that Mother acted inconsistently with her constitutionally protected right as a parent and the trial court did not err by granting custody to Grandfather based on Sam's best interests.

## I. Background

Mother lives in New York and she gave birth to Sam in New York in June 2019. Plaintiff ("Grandfather") lives in Vance County, North Carolina. When the complaint

in this matter was filed, Sam's biological father was "unknown" to Grandfather[2] although Mother later identified the biological father during this custody case. Grandfather traveled to New York to be with Mother when Sam was born. Soon after Sam's birth, Grandfather had a "consultation with the New York child protective services agency," and Grandfather "was able to obtain temporary custody of [Sam]." On 26 June 2019, about a week after Sam's birth, Grandfather filed an "Order to Show Cause Pursuant to Section 651 of the Family Court Act with Temporary Relief and Petition for Custody" in Suffolk County, New York seeking custody of Sam. He alleged Mother's home was a health hazard due to water damage and mold and that Mother was a hoarder. At the time of Sam's birth, Mother's home was not habitable due to "mold issues that had not been remediated or addressed by" Mother and the home "smelled of mold and cat urine." Grandfather also alleged concerns regarding Mother's mental health.

After Grandfather filed his petition in New York on 26 June 2019, the Suffolk County Family Court entered an order granting emergency temporary custody of Sam

---

[2] The custody complaint in North Carolina alleged that Sam's father is "unknown," and Mother admitted this allegation in her answer. Sam's birth certificate has no father listed. The New York Stipulation and other documents do not mention a father for Sam. However, Mother later admitted she knew the identity of the biological father although she had previously claimed he was an anonymous sperm donor. The trial court ordered that he be notified of this proceeding, and he accepted service of the complaint and other documents in the custody case and waived any further rights to notice or participation in this proceeding.

to Grandfather.[3]  On 28 June 2019, with the consent of both parties, the Suffolk County Family Court entered a "So-Ordered Stipulation"[4] ("Stipulation") which granted the parties "joint custody" of Sam, with Grandfather as "the physical residential custodian" and giving Mother "rights of supervised parental access through EAC or with a family member or other person approved by [Grandfather]" or as "otherwise agreed" by the parties in writing.  The Stipulation noted that Grandfather would pay for Mother's flight for a "scheduled visit" with Sam on 11-16 July as Grandfather "is currently residing in" North Carolina and Sam would reside with him.  Mother agreed to "undergo psychiatric evaluation and follow through with any and all recommendations by medical professionals" and to make the results of the evaluation available to Grandfather.  The Stipulation granted Grandfather "final decision making authority regarding all major decisions" as to Sam's care and education.  The Stipulation also provided that both parties "were entitled to receive all medical records and to converse with any physician or professional" regarding

---

[3] The 28 June 2019 Stipulation provides that Grandfather "*was* awarded temporary physical and residential custody of the infant issue by way of Order of the Honorable Matthew Hughes, which Order is on file with this Court" but the initial New York emergency order is not in our record. (Emphasis added.)

[4] Under New York law, "[a] so-ordered stipulation is a contract between the parties thereto and as such, is binding on them and will be construed in accordance with contract principles and the parties' intent[.]" *Tyndall v. Tyndall*, 144 A.D.3d 1015, 1016, 42 N.Y.S.3d 250, 251 (2016) (citation and quotation marks omitted).  The Stipulation also provided that it would be construed based upon New York law: "13. This Agreement is being executed and entered into in the State of New York.  This Agreement shall be construed in accordance with and shall in all respects be governed by the Laws of New York now or hereafter in effect, without giving effect to the choice of law provisions thereof, and regardless of where the parties, or either of them, in fact reside."

Sam. Mother agreed to have three mold tests done of her home in New York by a "certified air quality specialist," to be done in three month increments and "all three (3) tests shall prove to be negative for any mold." The Stipulation notes that Grandfather was represented by counsel in New York and Mother was *pro se*, although she "was encouraged and strongly advised to seek independent representation but has refused[.]" After entry of the Stipulation, Grandfather and Sam traveled back to his home in North Carolina "on June 29, 2019 and [ ] remained there since that time[.]"

On 17 June 2020, Grandfather filed a "Complaint for Custody and Protective Order" against Mother in Vance County, North Carolina. His complaint included allegations regarding the New York custody action and an attached copy of the Stipulation. On 6 July 2020, Mother filed a "Petition for Modification of Order of Custody" in New York, alleging that she lived in New York at the same address as she lived at the time of Sam's birth, and Grandfather and Sam lived in North Carolina. She alleged there "has been a change of circumstances" since the prior order in that "Mold Air test passed and evaluations met. Ready for unification.[5] Requirements met. N.Y State jurisdiction, not North Carolina." She further alleged Grandfather "is trying to remove my custody rights and order I can not fight for them with an order. Parental alienation, malice, hersay (sic) & defamation of my

_____

[5] Or "verification." This portion of the Motion is hand-written and difficult to read.

character." She also filed a "Petition to Enforce Custody or Visitation Order" in New York, making allegations regarding the entry of the Stipulation and the filing of the North Carolina custody action by Grandfather. She sought in part "to continue jurisdiction in New York" and "to protect my rights as mother and continue all cases in N.Y. Suffolk Family Court." On 22 July 2020, Mother also filed a Motion for "Dismissal Based on Lack of Jurisdiction" in Vance County.

On 2 October 2020, Mother filed an "Amended Answer and Motion to Dismiss" in Vance County. She alleged North Carolina did not have jurisdiction over custody of Sam and that New York "has Exclusive, Continuing Jurisdiction" regarding custody. She also admitted or denied the allegations of Grandfather's complaint for custody. As relevant to this appeal, Mother admitted Sam had been living in North Carolina with Grandfather since June 2019. She also admitted the allegation that Sam's father is "unknown."

On 23 October 2020, the Suffolk County Family Court in New York entered a "Final Order on Petition for Modification of Order of Custody made by Family Court." This Order indicates that the Honorable Heather P.S. James Esq, Referee in Suffolk County and Judge Adam Keith in Vance County conducted the hearing and both parties "appeared in North Carolina with counsel[.]" The New York Order declining to exercise jurisdiction stated:

> [A]fter examination and inquiry into the facts and
> circumstances of the case, after hearing the arguments of
> the parties through their counsel both in the Family Court

- 6 -

of the State of New York, County of Suffolk, before the undersigned and in the General Court of Justice, District Court Division, Vance County, NC [Docket# 20CVD592] (hereinafter, 'the North Carolina matter') before the Hon. Adam Keith, and for all of the reasons set forth upon the record this date,

**NOW, therefore, it is hereby**

**ORDERED**, that pursuant to DRL section 76-f, New York hereby declines exclusive continuing jurisdiction in favor of the more appropriate forum in North Carolina; and it is further,

**ORDERED**, that the parties are directed to appear in and cooperate with the further proceedings in the North Carolina matter.

On 3 June 2021, the trial court entered a temporary custody order addressing various issues including communication between the parties, family therapy, mental health assessments for both parties, and visitation for Mother. The trial court also noted that "[a]ccording to the parties, the natural father of the minor child" was an "anonymous sperm donor" and "all parties necessary to this action are properly before the court for hearing."

On 16 July 2021, the trial court entered an "Order Regarding Expert Appointment and Notice." This order appointed a psychiatrist to evaluate both parties and provide a report to the trial court for the 9 December 2021 hearing. In addition, by this point in the proceeding – after Grandfather had filed a motion seeking to compel Mother to identify the biological father based on a need for medical history information to assist in dealing with a health condition of the child – Mother

identified the previously "anonymous" sperm donor as the putative father of the child. This order states that "[n]either party objected to providing the putative father with notice of the proceeding pursuant to N.C. Gen. Stat. § 50A-205(a). Via the parties, the putative father has request[ed] that his name be placed under seal in the Court file." This order required Grandfather to "properly notice the putative father of the child-custody proceeding[.]"

On 9 September 2021, Mr. Doe,[6] the putative father of Sam, filed an "Acceptance of Service and Waiver of Responsive Pleading." Mr. Doe averred that "he is the biological father of the minor child involved in this proceeding" and he acknowledged receipt of the Summons, Complaint, Amended Answer, and orders "in this action"; that he was making a general appearance in this matter; and that he waived "further responsive pleadings" and "all notice requirements."

A hearing was held on custody on 1 June 2021[7] and 21 April 2022, and on 15 June 2022, the trial court entered a Custody Order granting legal and physical custody of Sam to Grandfather, with Mother to have limited visitation after complying with various requirements for Mother to consult with Sam's medical

---

[6] This is a pseudonym to protect the putative father's identity. Although the trial court directed the putative father's name be placed under seal, the Record on Appeal filed with this Court included his unredacted "Acceptance of Service and Waiver of Responsive Pleading" but was not sealed as required by North Carolina Rule of Appellate Procedure 42(a). *See* N.C. R. App. P. 42(a) ("Items sealed in the trial tribunal remain under seal in the appellate courts."). We have therefore *sua sponte* sealed the Record.

[7] The trial court noted the June 2021 court date resulted in the entry of the 3 June 2021 order requiring the parties to "obtain a psychiatric assessment based on each party's assertion that the other party had a serious mental health condition that would prevent that party from caring for the minor child."

providers to learn about his diagnosis of autism and "to understand [his] diagnosis and treatment options." Mother filed timely notice of appeal of this Order and included the orders entered on 23 October 2020 and 3 June 2021.[8]

## II. Subject Matter Jurisdiction under the UCCJEA

Although Mother's last argument on appeal addresses jurisdiction under the UCCJEA, we will address this first, as subject matter jurisdiction is a necessary prerequisite for a court to take any action. *See McKoy v. McKoy*, 202 N.C. App. 509, 511, 689 S.E.2d 590, 592 (2010) ("When a court decides a matter without the court's having jurisdiction, then the whole proceeding is null and void, *i.e.,* as if it had never happened." (citations and quotation marks omitted)). Mother's entire argument on this issue is "[t]he Vance County trial court never ruled on Mother's motion to dismiss due to lack of subject matter jurisdiction with a North Carolina order and instead stamped and filed the New York order." Despite Mother's failure to cite any authority or make an argument regarding jurisdiction under the UCCJEA, we will address this issue since we have a duty to inquire as to subject matter jurisdiction even if not raised by any party. *See Rinna v. Steven B.*, 201 N.C. App. 532, 537, 687 S.E.2d 496, 500 (2009) ("[T]his Court has not only the power, but the duty to address the trial court's subject matter jurisdiction on its own motion or *ex mero motu*." (citation omitted)).

---

[8] Other than her general argument regarding subject matter jurisdiction under the UCCJEA, Mother made no arguments on appeal regarding the 23 October 2020 and 3 June 2021 orders.

The trial court addressed subject matter jurisdiction in the Custody Order. The trial court made findings of fact regarding the New York custody proceeding and the New York court's entry of its order declining to exercise jurisdiction. In the Custody Order, the trial court concluded as follows:

> 1. The Court has subject matter jurisdiction over this matter and personal jurisdiction over the parties.
>
> 2. The Court hereby reincorporates the Findings of Fact set forth in the foregoing paragraphs as if set forth fully herein.
>
> 3. In October, 2020, New York State, the birth state of the minor child, declined to exercise exclusive jurisdiction in favor of the "more appropriate forum" in North Carolina.
>
> 4. The minor child has resided in North Carolina since shortly after his birth. North Carolina is the minor child's home state.

The 23 October 2020 "Final Order on Petition for Modification of Order of Custody" entered in Suffolk County Family Court in New York shows the trial courts of both North Carolina and New York held a hearing on Mother's motions filed in New York, with Mother and Grandfather and counsel for both participating. The Suffolk County court entered an order declining "exclusive continuing jurisdiction in favor of the more appropriate forum in North Carolina" and directed the parties "to appear in and cooperate with the further proceedings in the North Carolina matter." Mother did not appeal this New York order, and it is binding upon the North Carolina courts. *See Travelers Ins. Co. v. Rushing*, 36 N.C. App. 226, 229, 243 S.E.2d 420, 422

(1978) (explaining that the defendant cannot collaterally attack an order that she did not appeal). In addition, the trial court's findings show the trial court properly exercised subject matter jurisdiction under the UCCJEA based on the New York order.

### III.    Violations of Appellate Rules

Mother's second issue in her brief challenges 38 of the trial court's 144 findings of fact and "additional findings" within 12 of its conclusions of law. Mother asserts "[t]he trial court made findings of fact unsupported by competent evidence." Mother "respectfully contends that all or a significant portion of the following findings of fact are not supported by competent evidence; additional analysis is presented in Appendix C, organized by topic." She then lists 38 findings of fact and 12 more findings "within Conclusions of Law." Appendix C includes a 27-page table with columns noting "Court's Text" for the findings or conclusions challenged and "Analysis" including her argument as to each item, all single spaced in sans serif font, possibly calibri.[9] The substance of Appendix C sets out detailed arguments as to each

---

[9] (g) Formatting of Documents Filed with Appellate Courts. (1)  . . . Documents shall be prepared using a proportionally spaced font with serifs that is no smaller than 12-point and no larger than 14-point in size. Examples of proportionally spaced fonts with serifs include, but are not limited to, Constantia and Century typeface as described in Appendix B to these rules. The body of text shall be presented with double spacing between each line of text. Lines of text shall be no wider than 6 ½ inches, leaving a margin of approximately one inch on each side. The format of all documents presented for filing shall follow the additional instructions found in the appendixes to these rules. The

challenged finding of fact. North Carolina Rule of Appellate Procedure 28(d) requires this type of analysis and argument to be included in the body of the brief. *See* N.C. R. App. P. 28(d).

Mother's attempt to extend the word count of her principal brief by about twice the allowed limit is a violation of North Carolina Rule of Appellate Procedure 28(j), *see* N.C. R. App. P. 28(j), which is one of the "comprehensive set of nonjurisdictional requirements [ ]  designed primarily to keep the appellate process 'flowing in an orderly manner.'" *Dogwood Dev. & Mgmt. Co., LLC, v. White Oak Transp. Co., Inc.*, 362 N.C. 191, 198, 657 S.E.2d 361, 365 (2008) (citation omitted). Rule 28 of the North Carolina Rules of Appellate Procedure governs briefs filed before this Court, including word counts:

> (j) A principal brief filed in the Court of Appeals may contain no more than 8,750 words. A reply brief filed in the Court of Appeals may contain no more than 3,750 words.
>
> > (1) Portions of Brief Included in Word Count. Footnotes and citations in the body of the brief must be included in the word count. Covers, captions, indexes, tables of authorities, certificates of service, certificates of compliance with this rule, counsel's signature block, and appendixes do not count against these word-count limits.

N.C. R. App. P. 28(j).

---

format of briefs shall follow the additional instructions found in Rule 28(j).

N.C. R. App. P. 26(g)(1).

Although appendixes to briefs do not count against the word limitations of the brief, an appellant cannot simply label an argument as an appendix to extend the word count for the body of the brief indefinitely. *See* N.C. R. App. P. 28(b)(6) ("(b) An appellant's brief shall contain . . . (6) An argument, to contain the contentions of the appellant with respect to each issue presented. Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned. The argument shall contain a concise statement of the applicable standard(s) of review for each issue, which shall appear either at the beginning of the discussion of each issue or under a separate heading placed before the beginning of the discussion of all the issues. The body of the argument and the statement of applicable standard(s) of review shall contain citations of the authorities upon which the appellant relies. Evidence or other proceedings material to the issue may be narrated or quoted in the body of the argument, with appropriate reference to the record on appeal, the transcript of proceedings, or exhibits.").

The appendix has a purpose, as Rule 28(d) describes, and that purpose is not to extend the body of the brief. *See* N.C. R. App. P. 28(d). The purpose of the appendix is to include parts of the transcript, evidence, statutes, or other documents necessary or helpful to understand the "issue[s] presented in the brief" or, for the appellee, to address an issue raised in the opposing brief. *See id*. Mother's brief also includes two Appendixes which are proper appendixes as allowed by Rule 28(d) and Rule 30(e)(3); one appendix includes "portions of the transcript of the proceedings" and the other

includes an unpublished opinion she cites in her brief. *See* N.C. R. App. P. 28(d); *see also* N.C. R. App. P. 30(e)(3). An appendix is not intended to present the issues in the brief as if it were actually part of the body of the brief, but that is exactly what Appendix C does. Allowing an appendix to be used to extend the argument portion of the body of the brief indefinitely would defeat the entire purpose of the word limitations and formatting restrictions set out in Rule 28. *See* N.C. R. App. P. 28.

Rule 28(d) addresses both required and allowed appendixes to the appellant's principal brief:

> (d) Appendixes to Briefs. Whenever the transcript of proceedings is filed pursuant to Rule 9(c)(2), the parties must file portions of the transcript as appendixes to their briefs, if required by this Rule 28(d).
>
> (1) When Appendixes to Appellant's Brief Are Required. Except as provided in Rule 28(d)(2), the appellant must reproduce as appendixes to its brief:
>
> > a. those portions of the transcript of proceedings which must be reproduced in order to understand any issue presented in the brief;
> >
> > b. those portions of the transcript showing the pertinent questions and answers when an issue presented in the brief involves the admission or exclusion of evidence;
> >
> > c. relevant portions of statutes, rules, or regulations, the study of which is required to determine issues presented in the brief;
> >
> > d. relevant items from the Rule 11(c) or Rule 18(d)(3) supplement, the study of which are required to determine issues presented in the brief.

(2) When Appendixes to Appellant's Brief Are Not Required. Notwithstanding the requirements of Rule 28(d)(1), the appellant is not required to reproduce an appendix to its brief with respect to an issue presented:

> a. whenever the portion of the transcript necessary to understand an issue presented in the brief is reproduced in the body of the brief;
>
> b. to show the absence or insufficiency of evidence unless there are discrete portions of the transcript where the subject matter of the alleged insufficiency of the evidence is located; or
>
> c. to show the general nature of the evidence necessary to understand an issue presented in the brief if such evidence has been fully summarized as required by Rule 28(b)(4) and (5).

. . . .

(4) Format of Appendixes. The appendixes to the briefs of any party shall be in the format prescribed by Rule 26(g) and shall consist of copies of transcript pages that have been deemed necessary for inclusion in the appendix under this Rule 28(d). The pages of the appendix shall be consecutively numbered, and an index to the appendix shall be placed at its beginning.

N.C. R. App. P. 28(d).

As Mother's brief violates Rules 28(d) and 26(g), we must first consider whether this violation is a "substantial failure" to follow the appellate rules or a "gross violation" of the rules. *Dogwood*, 362 N.C. at 200-01, 657 S.E.2d at 366-67. If so, our Supreme Court has instructed that in our discretion, we should "fashion [ ] a

remedy to encourage better compliance with the rules." *Id*. at 198, 657 S.E.2d at 365. But as always, "it is preferred that an appellate court address the merits of an appeal whenever possible." *Id*. at 198-99, 657 S.E.2d at 365-66 ("We stress that a party's failure to comply with nonjurisdictional rule requirements normally should not lead to dismissal of the appeal[.] *See, e.g., Hicks v. Kenan,* 139 N.C. 337, 338, 51 S.E. 941, 941 (1905) (per curiam) (observing this Court's preference to hear merits of the appeal rather than dismiss for noncompliance with the rules); 5 Am.Jur.2d *Appellate Review* § 804, at 540 (2007) ('It is preferred that an appellate court address the merits of an appeal whenever possible. An appellate court has a strong preference for deciding cases on their merits; and it is the task of an appellate court to resolve appeals on the merits if at all possible.' (footnotes omitted)); Paul D. Carrington, Daniel J. Meador & Maurice Rosenberg, *Justice on Appeal* 2 (1976) ('Appellate courts serve as the instrument of accountability for those who make the basic decisions in trial courts and administrative agencies.'). Rules 25 and 34, when viewed together, provide a framework for addressing violations of the nonjurisdictional requirements of the rules. Rule 25(b) states that 'the appellate court may impose a sanction when the court determines that a party or attorney or both *substantially* failed to comply with these appellate rules. The court may impose sanctions of the type and in the manner prescribed by Rule 34[.]' Rule 34(a)(3) provides, among other things, that 'the appellate court may impose a sanction when the court determines that a petition, motion, brief, record, or other paper filed in the appeal *grossly* violated appellate court

rules.' Rule 34(b) enumerates as possible sanctions various types of monetary damages, dismissal, and 'any other sanction deemed just and proper.'" (emphasis in original) (citations, ellipses and brackets omitted)).

We determine Mother's noncompliance with the appellate rules to be a substantial violation. In fashioning a remedy for this violation, we have conducted a "fact-specific inquiry into the particular circumstances" of this case, keeping in mind "the principle that the appellate rules should be enforced as uniformly as possible. Noncompliance with the rules falls along a continuum, and the sanction imposed should reflect the gravity of the violation." *Id*. at 199-200, 657 S.E.2d at 366.

This violation does not rise to the level of dismissal of the appeal, which is an "extreme sanction to be applied only when less drastic sanctions will not suffice." *Id*. at 200, 657 S.E.2d at 366 (citations, quotation marks, and ellipses omitted).

> In most situations when a party substantially or grossly violates nonjurisdictional requirements of the rules, the appellate court should impose a sanction other than dismissal and review the merits of the appeal. This systemic preference not only accords fundamental fairness to litigants but also serves to promote public confidence in the administration of justice in our appellate courts.

*Id*.

Mother's substantial violation of the appellate rules imposes a burden on both this Court and Grandfather, and we must also consider the need to treat all parties to appeals fairly and equally and to enforce the rules uniformly. The first and most immediate consequence of a party's improper extension of the body of an appellant's

brief without seeking approval as allowed by the appellate rules, *see* N.C. R. App. P. 28, is obvious. That burden falls first upon the appellee, who incurs increased costs from responding to the entire brief, as he may not safely assume this Court will dismiss the appeal or simply ignore any additional improper argument; instead, he must pay his counsel to address all the appellant's arguments. And here, Grandfather unfortunately responded in like manner, adding to his brief on appeal a 31-page table including Appendix A, containing an "analysis of the 106 uncontested findings of fact supporting the court's conclusions" and the responses to the challenged findings of fact and Appendix B, addressing "the unchallenged, and therefore binding, findings of fact that support the finding of Grandfather being awarded sole legal and physical custody" and the "trial court's Conclusions of Law Mother claims are unsupported by competent evidence." North Carolina Rule of Appellate Procedure 28(d)(3) sets out the requirements for the appellee's brief:

> (3) *When Appendixes to Appellee's Brief Are Required.* An appellee must reproduce appendixes to its brief in the following circumstances:
>
> a. Whenever the appellee believes that appellant's appendixes do not include portions of the transcript or items from the Rule 11(c) or Rule 18(d)(3) supplement that are required by Rule 28(d)(1), the appellee shall reproduce those portions of the transcript or supplement it believes to be necessary to understand the issue.
>
> b. Whenever the appellee presents a new or additional issue in its brief as permitted by Rule 28(c), the appellee shall reproduce portions of the

> transcript or relevant items from the Rule 11(c)
> or Rule 18(d)(3) supplement as if it were the
> appellant with respect to each such new or
> additional issue.

N.C. R. App. P. 28(d)(3) (emphasis added).

Grandfather's Appendixes did not include any portions of the transcript or supplement and did not present any new or additional issues; they simply presented his arguments in response to Mother's arguments. Thus, Mother's substantial violation of the appellate rules led Grandfather to violate North Carolina Rule of Appellate Procedure 28(d) in like manner, as he attempted to address Mother's improperly extended arguments. *Id.*

Grandfather's response to Mother's violation of the appellate rules illustrates clearly why this Court must address rule violations and must at times sanction those who violate the rules: one party's violation of the rules may inspire the opposing party to respond in the same manner. But even if Grandfather had instead responded by filing a motion, such as a motion to strike part of Mother's brief or for some other sanction, he would still have to incur increased costs and may create additional delay in the appeal. Either way, this Court must spend more time in reviewing the improperly extended briefs[10] and determining how to address the issues or the rule

---

[10] Here, Mother's brief including improper Appendixes is 73 pages and about 17,000 words. She also included appropriate Appendixes comprised of transcript pages and an unpublished case as required by Rule 30(e)(3). *See* N.C. Gen. Stat. § 30(e)(3). Grandfather's brief including improper Appendixes is 83 pages and about 14,000 words.

violations and the appropriate sanction for any violations, while this Court has other appeals in which the parties have dutifully followed the appellate rules and are awaiting rulings on their appeals. It may seem it would be easier for this Court to overlook Mother's substantial rule violations (and Grandfather's similar substantial violation) and to address each of her arguments regarding the findings of fact raised in the Appendix in detail – instead of using this Court's time and effort to address the rule violations – but that may encourage others to believe they have found a new way to extend their briefs without seeking permission of this Court.

As a sanction for Mother's substantial violation of the North Carolina Rules of Appellate Procedure, we could elect not to address Mother's argument regarding the findings of fact entirely just by striking Appendix C, but we recognize that some of Mother's "argument," so to speak, regarding the findings of fact is presented not only within Appendix C; it is also presented within her Statement of the Facts. Grandfather correctly notes in his Restatement of the Facts that

> [p]ursuant to Rule 28(b)(5) of the North Carolina Rules of Appellate Procedure, the appellant is required to provide a ***non-argumentative*** summary of material facts. Defendant-Appellant failed to follow this directive in her brief, and Plaintiff-Appellee makes this restatement of the facts, in compliance with the North Carolina Rules of Appellate Procedure.

(Emphasis in original.)

Mother's argumentative Statement of Facts is yet another violation of the appellate rules, but here, Grandfather responded in a way allowed by the appellate

rules. *See* N.C. R. App. P. 28(b)(5) ("An appellant's brief shall contain . . . . (5) A full and complete statement of the facts. This should be a non-argumentative summary of all material facts underlying the matter in controversy which are necessary to understand all issues presented for review[.]"); *see also* N.C. R. App. P. 28(c) ("[The appellee's brief] does not need to contain a statement of . . . the facts . . . unless the appellee disagrees with the appellant's statements and desires to make a restatement[.]"). Mother's statement of the facts is primarily based on her own testimony and evidence presented in the light most favorable to her and most disfavorable to Grandfather. Of course, an appellate advocate should seek to highlight the facts favorable to their client's position, but the *argument* should be in the "Argument" section of the brief, not in the Statement of Facts. *See* N.C. R. App. P. 28(b)(5)-(6).

Thus, as a sanction for Mother's substantial appellate rule violations, pursuant to Rules 25 and 34, in our discretion, we will not address or consider Mother's arguments presented in Appendix C. *See* N.C. R. App. P. 25(b) (stating upon a substantial failure to comply with the appellate rules, "The [C]ourt may impose sanctions of the type and in the manner prescribed by Rule 34 for frivolous appeals"); *see also* N.C. R. App. P. 34(b)(3) ("(b) A court of the appellate division may impose one or more of the following sanctions: . . . (3) any other sanction deemed just and proper."). We will address Mother's challenges to the findings of fact and conclusions of law only to the limited extent they are referenced in the body of the brief, including

the Statement of Facts, but we will not address each one in detail. In determining this sanction, we have also considered Grandfather's substantial violation of the appellate rules in extending the body of his brief by attaching an improper appendix in response to Mother's improper appendix, but because he was trying to respond to Mother's brief, and because his brief otherwise complies with the Appellate Rules, we will not sanction Grandfather. However, we admonish counsel for both parties to comply with the Rules of Appellate Procedure in the future and note that if the appellant violates a rule, this does not give the appellee license to violate the rules in response.

Overall, Mother argues the existence of evidence tending to conflict with the trial court's findings of fact or quibbles with the exact wording of a finding, but it is well established that a finding of fact must be upheld if there is competent evidence to support it.

> The standard of review when the trial court sits without a jury is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts. In a child custody case, the trial court's findings of fact are conclusive on appeal if supported by substantial evidence, even if there is sufficient evidence to support contrary findings. Unchallenged findings of fact are binding on appeal. Whether the trial court's findings of fact support its conclusions of law is reviewable *de novo*. If the trial court's uncontested findings of fact support its conclusions of law, we must affirm the trial court's order.

*See Scoggin v. Scoggin*, 250 N.C. App. 115, 117-18, 791 S.E.2d. 524, 526 (2016)

(citations, quotation marks, ellipses, and brackets omitted).

The trial court has the duty to consider the weight and credibility of the evidence, and we may not substitute our judgment for that of the trial court. *See Cornelius v. Helms*, 120 N.C. App. 172, 175, 461 S.E.2d 338, 340 (1995) ("As fact finder, the trial court is the judge of the credibility of the witnesses who testify. The trial court determines what weight shall be given to the testimony and the reasonable inferences to be drawn therefrom."). Mother has failed to demonstrate any of the trial court's challenged findings of fact were unsupported by competent evidence.

## IV. Modification of Custody or Initial Custody Determination

Mother next contends that "[t]he trial court erred by concluding that the temporary New York custody order 'became more of a permanent custody agreement in that [Mother] took no court action to regain custody of the minor child[.]'" Mother argues that the Stipulation was a temporary order but "[i]f the court truly believed that the New York order converted to permanent, it should have unambiguously stated that, rather than labeling it 'more of a permanent agreement,' and conducted a substantial-change analysis per N.C. Gen. Stat. §50-13.7 (2021) before considering the modification." In other words, Mother first contends the Stipulation should properly be considered as a temporary order, but *if* the trial court considered it a permanent order, it erred by treating it as a permanent order and then modifying custody without conducting a substantial change analysis. Mother's argument concludes by noting "[p]erhaps the qualifier 'more of a' indicates the trial court did

not fully intend to conclude the New York order converted to permanent, explaining why it did not treat it as such."

Although it would be to Grandfather's benefit to agree with Mother that the trial court treated the Stipulation as a temporary order, he instead argues the trial court did treat it as a permanent order but did not err by doing so. He argues that "it is not contested that the June 2019 New York temporary agreement was intended to be a temporary custodial arrangement." But because of "passage of time and the lack of action by Mother, the trial court correctly held that the June 2019 New York temporary agreement became more of a permanent agreement." Grandfather has taken a different position on appeal than he did before the trial court, but he then argues why the trial court did not err by treating the Stipulation as permanent, even though it did not actually characterize the Stipulation as a permanent order.

As to Grandfather's argument, we note that neither party argued at the hearing that the Stipulation should be considered as a permanent order or that the trial court should consider modification based upon a substantial change in circumstances since entry of the Stipulation. Grandfather did not file a motion seeking modification of the Stipulation; he filed a complaint seeking an initial determination of permanent custody. In other words, Grandfather argues a theory on appeal he did not raise before the trial court, but "[o]ur Supreme Court has long held that where a theory argued on appeal was not raised before the trial court, the law does not permit parties to swap horses between courts in order to get a better

mount in the appellate courts." *State v. Holliman*, 155 N.C. App. 120, 123, 573 S.E.2d 682, 685 (2002) (citations and quotation marks omitted).

We review the trial court's characterization of the Stipulation as a temporary or permanent order *de novo*:

> [W]hether an order is temporary or permanent in nature is a question of law, reviewed on appeal de novo.
>
> As this Court has previously held, an order is temporary if either (1) it is entered without prejudice to either party; (2) it states a clear and specific reconvening time in the order and the time interval between the two hearings was reasonably brief; or (3) the order does not determine all the issues.

*Smith v. Barbour*, 195 N.C. App. 244, 249, 671 S.E.2d 578, 582 (2009) (citations, quotation marks, and brackets omitted).

Neither the title of an order nor the intentions of the parties or court at the time of entry of the order controls whether an order is treated as temporary or permanent, as a temporary order may become permanent after a reasonable passage of time. *See id.* ("[T]he trial court's designation of an order as 'temporary' or 'permanent' is not binding on an appellate court." (citation omitted)); *see also LaValley v. LaValley*, 151 N.C. App. 290, 292-93, 564 S.E.2d 913, 915 (2002) ("[The order] was, however, converted into a final order when neither party requested the calendaring of the matter for a hearing within a reasonable time after entry of the [o]rder." (footnotes omitted)).

First, as Mother's argument recognizes, it is not apparent that the trial court treated the Stipulation as a permanent order, so we must consider what, if anything, the trial court concluded about whether the Stipulation was permanent or temporary. The Custody Order does not address this issue directly, but overall, the Custody Order's findings and conclusions treat the determination of custody as an initial ruling on permanent custody and did not treat the Stipulation as a permanent order. The Custody Order tacitly treated the Stipulation as a temporary order, just as it treated its own 3 June 2021 Temporary Order as a temporary order. Neither party filed a motion in the North Carolina action to modify the Stipulation and both parties' pleadings treated the custody issue before the trial court as an initial determination following a temporary emergency order entered in New York. Although we recognize those pleadings do not necessarily control the issue, we also note neither party argued at the hearing that the Stipulation should be considered as a permanent order or that the trial court should consider modification based upon a substantial change in circumstances since entry of the Stipulation.

Mother's primary argument at trial was that as a natural parent, she had a constitutional right to custody unless she was found by clear and convincing evidence to be unfit as a parent or she had acted inconsistently with her rights as a parent. And in keeping with the parties' arguments at the hearing, the only mention of a "permanent agreement" in the Custody Order is included in one of the trial court's conclusions addressing how Mother had acted inconsistently with her

constitutionally protected rights as a parent. Specifically, the trial court concluded:

> 9. Based on clear and convincing evidence, since [Sam's] birth, . . . *[M]other has acted inconsistently with her constitutionally protected status as a parent* by, including but not limited to, the following, in that:
>
>> a. Since [Sam's] birth, [Mother] has been employed but has provided no child support to [Grandfather] despite [Mother's] ability to provide some monetary support.
>>
>> b. The June 2019 New York temporary agreement became more of a permanent agreement in that [Mother] took no court action to regain custody of [Sam] in the New York court or in any other court until [Grandfather] filed this action for custody;
>>
>> c. [Mother] also did not timely act under the terms and conditions of the temporary agreement to rectify her home, but expected [Grandfather] to pay for the remediation or repairs to her home in New York (the home he'd helped her to buy);
>>
>> d. During her visits on the phone or in person with [Sam], [Mother] has made very little effort to establish a parent/child bond with [Sam], and, instead, has focused primarily on memorializing visits and calls in the form of photos and videos and in lambasting [Grandfather] for his care of [Sam] while [Sam] is present.

(Emphasis added.)

The rest of Conclusion No. 9 includes twelve more subparagraphs. In summary, these subparagraphs address Mother's profanity and screaming during phone calls to Grandfather; her failure to spend quality time with Sam when visiting in North Carolina; her failure to consult with Sam's medical providers and to participate in Sam's medical and psychological care; Mother's consistent and repeated

rejection of Sam's diagnoses made by qualified medical professionals; her failure to truthfully answer Grandfather's complaint by "admitting" the child's father was "unknown" while she did know the identity of the child's biological father; her "disregard of the truth" which included the potential to affect the health of the child; and her intent to remain in New York and not to move to be closer to Sam.

Considering the words "more of a permanent agreement" in context, Mother is correct: the trial court did *not* conclude the Stipulation was a permanent order or that it should be treated as such due to passage of time. Instead, the trial court's statement that the "June 2019 New York temporary agreement became *more of a permanent agreement*" because Mother took no action to regain custody was not a conclusion that the trial court was treating the Stipulation as a permanent order. (Emphasis added.) Instead, the trial court was simply describing Mother's failure to take action to regain custody either in New York or North Carolina until after Grandfather filed for custody here. Thus, we need not address the part of Mother's argument that the trial court erred by treating the Stipulation as a permanent order further. We will not address Grandfather's argument that the trial court correctly treated the Stipulation as a permanent order because that is not what the trial court determined and because neither party presented this argument to the trial court. The trial court treated the Stipulation as a temporary order, and the trial court did not err by treating it as a temporary order.

There is no dispute that the Stipulation entered in New York about 2 weeks

after Sam's birth was intended to be temporary. It was entered to address an urgent situation upon his birth: Mother's home was not safe for a baby; there were serious concerns regarding Mother's mental health; and Grandfather was the only other available person to care for Sam, but Grandfather lives in North Carolina. As a non-parent, he needed the ability and authority to take Sam to North Carolina and to make decisions regarding Sam's medical care and other needs. The Stipulation did not determine all issues. The Stipulation set out specific requirements for Mother to be able to regain custody of Sam and to ensure Mother would be able to care for Sam safely; she was required to remediate the mold in her home and to have a mental health evaluation and follow treatment recommendations. The only factor favoring treating the Stipulation as a permanent order was that it did not set a date for another hearing, although the terms of the Stipulation clearly anticipated further hearings to review Mother's progress and compliance.[11]

After *de novo* review, we conclude the trial court properly considered the Stipulation was a temporary order and the Stipulation did not convert to a permanent

---

[11] We also note the Stipulation was entered under New York law and provided it should be "*construed in accordance with and shall in all respects be governed by the Laws of New York now or hereafter in effect, without giving effect to the choice of law provisions thereof, and regardless of where the parties, or either of them, in fact reside*." (Emphasis added.) Although it is clearly a temporary custody order, it is different in many respects from North Carolina temporary orders entered under North Carolina General Statute Chapter 50. *See generally* N.C. Gen. Stat. Ch. 50 (2023). New York and North Carolina have substantial differences in court processes and procedures, especially in Family Court. *See generally* N.Y. Legis. 686 (2023). We recognize the possibility that New York statutes or rules of the Suffolk County Family Court may set out or anticipate additional proceedings even though the Stipulation did not specifically set a court date, but as neither party made this argument to the trial court or addressed it on appeal, we will not address it either.

order based on the passage of one year. However, we also note that even if we treated the Stipulation as a permanent order, the result would be the same. The trial court's extensive and detailed findings of fact set out many substantial changes in circumstances affecting the best interest of the minor child, even if it does not use those exact words. Sam was less than 3 weeks old when the Stipulation was entered; at the time of the hearing, he was age three. The substantial changes in circumstances affecting his best interests are so obvious in the trial court's 144 findings of fact we will not belabor this point further. *See Shipman v. Shipman*, 357 N.C. 471, 479, 586 S.E.2d 250, 256 (2003) ("[T]he effects of the substantial changes in circumstances on the minor child in the present case are self-evident, given the nature and cumulative effect of those changes as characterized by the trial court in its findings of fact.").

## V. Mother's Constitutionally Protected Rights as a Parent

Mother's last argument is that "[t]he trial court erred by conducting a best interests of the child analysis to determine custody when mother has not acted inconsistently with her constitutionally protected status as a parent and is not unfit." "A trial court's determination that a parent has acted inconsistently with his or her constitutionally protected status as the parent is subject to de novo review[.]" *In re B.R.W.*, 381 N.C. 61, 77, 871 S.E.2d 764, 775 (2022) (citation omitted).

We first note that the trial court's 144 findings of fact made by "clear and convincing evidence" are all binding on this Court. *See Scoggin*, 250 N.C. App. at

117-18, 791 S.E.2d. at 526. Most of the findings were not challenged on appeal, and Mother has not shown merit in her challenges to the rest of the findings, as discussed above. Most of Mother's argument focuses on her efforts to improve her situation and her view of the evidence. For example, she argues she

> has diligently worked toward [Sam's] return. The trial court found that, per the terms of the temporary New York order, Mother completed the psychological examination and that Mother "had professionals in to clear the mold" and spent over $10,000 on remediation to make her home safe for [Sam's] return, but it still "took a long time to get the mold totally removed."

Mother is correct that the order does include some findings favorable to her, such as the findings about ways she complied with the Stipulation. In fact, the trial court did not find Mother was unfit as a parent but concluded she "is a fit and proper person to have visitation" with Sam. But overall, the findings show Mother's contact with Sam was very limited, although Grandfather did not prevent Mother from visiting or participating in Sam's medical visits and care. Instead, he "paid for the majority of [Mother's] flights from New York to North Carolina in the first few months." He also provided information regarding Sam's medical providers, but Mother refused to communicate with them.

Sam's medical needs were an important factor in this case. The trial court made extensive findings regarding Sam's medical issues, including a hospitalization at about eighteen months old. Sam had "developmental problems including muscles in the right foot and hip," delays in his "speech development" and "issues with his

hands." By April 2022, Sam was diagnosed with "level III of autism" for which he was receiving "daily therapy" in addition to "physical therapy twice a week, occupational once a week and speech therapy once a week." Although Mother was informed about these medical needs and had more than a year to arrange for a transition of care to New York, Mother "presented no plan for any kind of therapy for [Sam]." Mother also "has no childcare arrangements for [Sam] while she works because she plans to take" him with her to work. "[Mother] made one visit with [Grandfather] to [Sam's] pediatrician in December, 2019. She looked up the doctor's credentials and did not like them." She did not participate in Sam's care or communicate with Sam's medical providers although Grandfather provided information for all the providers on Our Family Wizard. Mother provided no financial support for Sam, although she was employed. In contrast, Grandfather provided for all Sam's needs and took Sam to "approximately 120 medical appointments" in the two years preceding the hearing.

The trial court also made many findings addressing Mother's increasingly hostile behavior toward Grandfather and that her angry outbursts sometimes were in Sam's presence. The trial court made detailed findings regarding Mother's "numerous calls to [Grandfather] in which she screamed at him, used a lot of profanity directed toward [Grandfather] and repeated the profanity over again multiple times in each call. On at least two occasions, [Sam] was present and became upset during the calls."

Mother had some visits in New York with Sam but had never taken him to her home, even after the mold remediation was done, because "she only wants him there when he permanently comes to live with her." Despite Sam's autism and difficulty adjusting to changes in his environment, Mother "refused to take into consideration any affect that a new place to live or to stay overnight would have on [Sam] and has proposed no plan of transition for [Sam] if she is awarded custody." Overall, the findings indicate Mother was entirely unprepared to care for a child with Sam's extensive developmental and medical needs, nor had she made any effort to address these issues.

We will not repeat the extensive findings the trial court relied on to conclude Mother had acted inconsistently with her constitutionally protected rights as a parent, but the trial court relied primarily on the facts noted above in our discussion of Conclusion of Law No. 9. In addition, the trial court made extensive findings regarding Grandfather's care for Sam, his efforts to assist Mother, and his close and loving relationship with Sam.

As our Supreme Court directed in *In re B.R.W.*, 381 N.C. at 82-84, 871 S.E.2d at 779-80 (citations, quotation marks, and brackets omitted), the trial court must examine the facts of each case to determine if a parent has acted in a manner inconsistent with her rights as a parent:

> [U]nfitness, neglect, and abandonment clearly constitute conduct inconsistent with the protected status parents may enjoy, but other types of conduct, which must be viewed on

a case-by-case basis, can rise to this level so as to be inconsistent with the protected status of natural parents. For that reason, there is no bright line rule beyond which a parent's conduct meets this standard; instead, we examine each case individually in light of all of the relevant facts and circumstances and the applicable legal precedent. *Boseman*, 364 N.C. at 549, 704 S.E.2d 494. *See also Estroff v. Chatterjee*, 190 N.C. App. 61, 64, 660 S.E.2d 73 (2008) (acknowledging that no litmus test or set of factors can determine whether this standard has been met.). In conducting the required analysis, evidence of a parent's conduct should be viewed cumulatively.

. . . .

Finally, we reiterated in *Owenby* that a parent's failure to maintain personal contact with the child or failure to resume custody when able could amount to conduct inconsistent with the protected parental interests.

In *Price*, we directed trial courts, in evaluating cases involving nonparental custodial arrangements, to consider the degree of custodial, personal, and financial contact the parent maintained with the child after the parent left the child in the nonparent's care.

. . . .

Finally, in *Speagle*, we held that, when a trial court resolves the issue of custody as between parents and nonparents, any past circumstance or conduct which could impact either the present or the future of a child is relevant, notwithstanding the fact that such circumstance or conduct did not exist or was not being engaged in at the time of the custody proceeding.

The trial court's extensive factual findings support its conclusion that Mother acted inconsistently with her constitutionally protected rights as a parent and the trial court therefore correctly considered the best interests of the child in awarding

custody to Grandfather.

## VI.    Conclusion

As we determine the trial court properly exercised jurisdiction under the UCCJEA, its findings are supported by competent evidence, and the findings are sufficient to conclude Mother acted inconsistently with her protected status as a parent, we affirm the trial court's Custody Order.

AFFIRMED.

Chief Judge DILLON and Judge ZACHARY concur.